# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **CARL CORNELIUS FREEMAN**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action Number |
| v. | ) | **2:08-cv-2272-AKK** |
| | ) | |
| **THE HOME DEPOT, INC.,** | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

Before the court is The Home Depot's ("Defendant") Motion for Summary Judgment against Carl Cornelius Freeman's ("Mr. Freeman") claims under the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. §§ 4301 *et seq.* ("USERRA").  Doc. 36.  Mr. Freeman responded, docs. 43, 49, & 56,[1] Defendant replied, doc. 57, and the motion is ripe for consideration. For the reasons explained more fully below, the court **GRANTS**, in part, and

---

[1] Mr. Freeman's initial response requested additional document discovery, doc. 43, which the court treated as a motion to compel, doc. 44, granted, doc. 46, and entered a confidentiality order to protect the confidential nature of several employee personnel files, doc. 47.  Defendant then moved to strike Mr. Freeman's second response on relevancy grounds and for failure to conform to the court's rules.  Doc. 51.  In its discretion and in light of Mr. Freeman's *pro se* status, the court will consider Mr. Freeman's second response, doc. 49, and third response, doc. 56, but will, as always, limit its consideration to only relevant and supported factual assertions, if any, made therein.  Accordingly, the court **DENIES** Defendant's motion to strike.

**DENIES**, in part, Defendant's motion for summary judgment.

## I. STANDARD OF REVIEW

Under Rule 56(c)(2) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id*. at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970);

2

*see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252)).

Mr. Freeman proceeds in this case *pro se*, that is, without an attorney. Thus, the court must construe Mr. Freeman's pleadings liberally. *See Alba v. Montford*, 517 F.3d 1249, 1252 (11th Cir. 2008) (citation omitted). Nonetheless, "[o]nce a *pro se* litigant is in court, he is subject to the relevant laws and rules of court, including the Federal Rules of Civil Procedure." *Smith v. Fla. Dep't of Corr.*, 369 F. App'x 36, 38 (11th Cir. 2010) (unpublished) (quoting *Moon v. Newsome*, 863 F.2d 835, 837 (11th Cir. 1989)). Therefore, while the court construes Mr. Freeman's pleadings liberally and affords him significant leniency in light of his *pro se* status, "a *pro se* litigant does not escape the essential burden under summary judgment standards of establishing that there is a genuine issue as to a

3

fact material to his case in order to avert summary judgment." *Brown v. Crawford*,

906 F. 2d 667, 670 (11th Cir. 1990); *see also Smith*, 369 F. App'x at 38.

## II. FACTUAL BACKGROUND[2]

The facts of this case stretch over many years and are organized both

chronologically and by subject matter.  To summarize, Mr. Freeman asserts that

Defendant attempted to force him to choose between his military duty and

employment, denied him necessary time off to attend military drills, disciplined

him for missing work to attend military drills, retaliated against him when he

sought relief from the Department of Labor ("DOL"), and denied him promotional

opportunities, wage increases, and bonuses based upon his military status and his

deployment overseas.  Mr. Freeman seeks both compensatory damages and

injunctive relief.  Doc. 16.

A.   <u>Military Duty</u>

Mr. Freeman joined the United States Navy Reserves on December 2, 1988.

Doc. 41-1 ("Pl. Dep.") 20:8-12, 24:11-13.  He is required to participate in drill

---

[2]Unfortunately, Mr. Freeman has repeatedly failed to present the court with a set of facts or to dispute the facts set out by Defendant.  Thus, to the extent they are supported by the record and conceded by Mr. Freeman, Defendant's assertion of facts are undisputed.  Moreover, Mr. Freeman's dates for specific events are vague and inconsistent.  In his deposition, Mr. Freeman admits to confusing the years for certain events in 2004 and 2005.  Pl. Dep. at 163:20-166:2.  As a result, the court construes all evidence in a light most favorable to Mr. Freeman, but where the date inconsistencies are immaterial or in clear error given the record evidence, the court will form a consistent time-line.

duty two days each month and two weeks every year. *Id.* 23:7-19. Mr. Freeman's reserve unit can be placed on alert status and deployed to armed conflicts at any moment. *Id.* 41:19 - 42:1.

B.    Home Depot Employment Background

Defendant hired Mr. Freeman in Store No. 880 in Birmingham, Alabama on May 6, 1996, as a sales associate. *Id.* 17:4-13. Mr. Freeman has worked at Store No. 880 at all times relevant to this dispute, and is now a department supervisor.

When hired in 1996, Mr. Freeman made $10.50 per hour. As of March 2010, Mr. Freeman makes $18.36 per hour. Doc. 41-13. Defendant awards managers discretionary pay raises and promotions based on job performance; "there are no automatic promotions at the managerial level." Doc. 41-14 ¶¶ 8-9. Mr. Freeman testified that pay raises averaged between three to five percent. Pl. Dep. 76:7-9.

C.    Mr. Freeman's 2001 Discipline

After the September 11, 2001, terrorist attacks, the president placed Mr. Freeman's reserve unit on alert status in anticipation of deployment. Pl. Dep. 41:19 - 42:11. Mr. Freeman informed his store manager, Steve Smith ("Smith"), who expressed support for Mr. Freeman's military duty. *Id.* 41:5-12; 42:12 - 43:12. However, Kevin Kahrig ("Kahrig"), the assistant store manager ("ASM")

5

supervising Mr. Freeman, allegedly informed Mr. Freeman that he "needed to choose between Home Depot and the military." *Id.* 41:13-18. Although, Mr. Freeman, as department supervisor, drafted the work schedule for his department, apparently when Mr. Freeman refused to choose Home Depot over the military, Kahrig told Mr. Freeman "I'll help you make that choice" and allegedly rewrote Mr. Freeman's work schedule for October, November, and December 2001 and specifically scheduled Mr. Freeman for shifts that conflicted with Mr. Freemans's mandatory drill weekends. *Id.* 43:14 - 44:1; 45:18 - 46:9. Mr. Freeman protested, but Lonnie Fowler ("Fowler"), the new store manager as of October 2001, refused to change the schedule. *Id.* 44:2 - 45:11. Instead, Fowler informed Mr. Freeman that, "If you're full-time, your availability is any time," and that Mr. Freeman's military duty was "part-time" because "[w]e're your full-time." *Id.* 44:17 - 45:1.

As a result, Mr. Freeman received a write-up from Fowler and Kahrig for missing work to attend drills in October, November, and December of 2001. *Id.* 46:13 - 47:6, 310:3-23. In December, Fowler and Kahrig issued Mr. Freeman a final written disciplinary notice for missing scheduled work which indicated termination (though he was not). *Id.* 47:2-11, 60:23 - 61:16. In response, Mr. Freeman informed Kahrig and Fowler that they were violating USERRA. *Id.* 50:13 - 53:4.

6

In addition to the disciplinary write-ups, Mr. Freeman also claims that Defendant's promotional opportunities database improperly listed him as ineligible for a salaried management position because it classified Mr. Freeman as having an inflexible work schedule.  Mr. Freeman believes this classification is because of his military commitments.  Doc. 41-16 at 5; Pl. Dep. 334:20 - 338:19. Mr. Freeman believes further that Kahrig and Fowler changed the database to reflect his military status.  Pl. Dep. 336:8-19.  However, Mr. Freeman has no evidence to support this contention and never asked Kehrig or Fowler if they were responsible for the notation in the database.  *Id.* 336:13 - 337:15.  Moreover, Mr. Freeman has no evidence to suggest that he would have received a promotion but for the notation in the database.  *Id.* 338:14-19.

Based on this treatment, Mr. Freeman filed a complaint with the Department of Labor ("DOL") on December 22, 2001, which the DOL received on January 22, 2002.  Doc. 41-16.  In that complaint, Mr. Freeman asserted that his managers purposely scheduled his work shifts to conflict with his drills and then warned him of potential termination for missing work.  *See id.* at 5.  Mr. Freeman further asserted that Kahrig and Fowler tampered with the computer database to deprive him of promotional opportunities.  *Id.*

     D.    <u>Mr. Freeman's January 2002 Performance Evaluation and</u>

Consequences

On January 29, 2002, Kahrig completed Mr. Freeman's performance evaluation and rated Mr. Freeman a "1: Needs Much Improvement," the lowest rating available.  Doc. 41-2 at 6.  Kahrig applauded Mr. Freeman as a "work horse," but criticized his management skills, inability to motivate and lead his associates, and substandard customer service.  *See id.*  As a result, Mr. Freeman did not receive a pay raise.[3]  Doc. 41-13.  Mr. Freeman asserts Defendant retaliated against him for "going to the Department of Labor" by giving him a negative review and depriving him of a pay raise.  Pl. Dep. 62:7-13.

Sometime in late 2001 or early 2002, Mr. Freeman discussed his work schedule-drill duty conflict with Defendant's District Manager, Ricky Jordan ("Jordan"), and complained about Fowler's and Kahrig's harassment.  *Id.* 47:17 - 49:13.  The discussion occurred after Jordan attended a meeting in which Fowler complained of Mr. Freeman's unavailability due to drill duty.  *Id.* 47:10-13.  Unfortunately, Jordan left the company shortly afterward and failed to mention the alleged harassment to his replacement.  *Id.* 49:14-20.  Nonetheless, perhaps as a result of the complaint to Jordan, in early 2002, Fowler allegedly apologized to

---

[3]However, as discussed in the next section, Mr. Freeman received a pay adjustment three days later.

Mr. Freeman for following Kahrig's recommendation with respect to the write-ups. *Id.* 61:7-11. Interestingly, Defendant terminated Fowler sometime thereafter, which Mr. Freeman attributed to the lack of cleanliness and organization in Fowler's department. *Id.* 72:19 - 73:22. Defendant also terminated Kahrig in early 2002 for undisclosed reasons. *Id.* 75:14-23.

     E.    <u>Mr. Freeman's New 2002 Supervisors</u>

On February 1, 2002, the new store manager, Brian Richardson ("Richardson"), awarded Mr. Freeman a merit pay raise adjustment, from $15 to $15.45 per hour, unrelated to a "regular review" after Mr. Freeman informed him of Fowler's previous complaints of his performance. *See id.* 90:9 - 91:6; *see also* doc. 41-13.[4] Although no other supervisor received a pay raise at that time, Pl. Dep. 91:7-12, Mr. Freeman testified that Richardson increased his pay for reasons unrelated to Fowler or Kahrig's conduct and that the increase did not negate the conduct. *Id.* 91:9 - 92:15. Consequently, Mr. Freeman continued to pursue the DOL complaint "[b]ecause the merit increase did not have anything about the write-ups [and Mr. Freeman] felt that the write-ups would still affect [his] career at

---

[4] The court notes a discrepancy between Mr. Freeman's recollection that Richardson performed this review and the documentation in his personnel file, which includes a hand-written note on his January 29, 2002, review that states, "Changed to 'C' Rating. Reviewed by Kevin King." Doc. 41-12 at 36. In any event, it is undisputed that Defendant changed the review.

Home Depot. That's why [he] didn't want to just accept that merit increase as a compensation for [his] missing the wage increase." Pl. Dep. 93:3-14.

In the spring of 2002, the DOL asked Defendant to "expunge" Kahrig and Fowler's disciplinary write-ups from Mr. Freeman's personnel file. *Id.* 111:5 - 112:9, 93:8-18. Apparently, the write-ups remain in Mr. Freeman's personnel file. *Id.* 311:1-23. Moreover, although Mr. Freeman informed the DOL that he did not consider himself whole without an apology from an executive representative of Defendant, *id.* 117:21 - 118:19, the DOL dropped Mr. Freeman's case nonetheless because "the DOL considered that they've done all they can do on the situation, that they've met their objective on it." *Id.* 120:15 - 121:17.

On October 4, 2002, Mr. Freeman's new ASM, Kevin King ("K.King"), conducted Mr. Freeman's performance review and rated Mr. Freeman as a "C Performer," which made Mr. Freeman ineligible for promotion.[5] Doc. 41-4 at 1. While K.King noted that Mr. Freeman was "a good dept. manager," that he had "really stepped up over the past few months," and that he was "very dependable," K.King concluded Mr. Freeman needed to "focus on self-development" and rated him at the third-tier of Potential, "Grow in Position," rather than the second tier

---

[5]In 2002, Defendant changed the way it evaluated its employees from a numerical scale of 1-5 to an alphabet-based scale consisting of "A - Outstanding," "B - Achiever," "C - Performer," and "D - Improvement Required." *See* doc. 40 at 13 n.7.

"Promotable" or the top tier "High Potential." *Id.* K.King also rated Mr.

Freeman's leadership as "3-Acceptable." *Id.* Mr. Freeman does not believe

K.King discriminated against him. Pl. Dep. 127:3-5.

F.    Reduction in Mr. Freeman's Associate Workforce

In late 2002, Defendant moved Mr. Freeman to the millworks department

and, shortly thereafter, reduced the number of associates in the department, *id.*

204:1 - 207:5, which Mr. Freeman attributed to retaliation. Likewise, Mr.

Freeman contends Defendant reduced its workforce in each of his subsequent

departments. *Id.* 207:6 - 208:23. However, Mr. Freeman believes Defendant

targeted his departments for reductions because it knew he was a hard-worker who

would make sure the departments still met their targets. *Id.* 202:7-11, 204:16-17,

206:21-22. Moreover, Mr. Freeman admits he has no evidence Defendant made

the cuts because of him and that he is "just assuming." *Id.* 204:1-23, 206:10 -

208:23.

G.    Mr. Freeman's 2003 Employment

Mr. Freeman did not deploy overseas during 2003 and raises no complaints

for that year. Pl. Dep. 129:22 - 131:2. On Mr. Freeman's January 19, 2003,

evaluation, K.King again rated Mr. Freeman on the third of four tiers in the

Overall Performance, Leadership, and Potential categories. Doc. 41-5. Again,

11

K.King noted that Mr. Freeman was "one of the most hardworking" supervisors but needed to "hold his associates to the same standards." *Id.* While K.King lauded Mr. Freeman's customer-relations and work ethic, he told Mr. Freeman to "focus on accountability of associates" and to "develop associates."[6] *Id.* On January 31, 2003, Mr. Freeman received a pay increase to $16.20 an hour. Doc. 41-13.

Thereafter, on August 22, 2003, Mr. Freeman again received performance ratings in the third-tier in each of the Overall Performance, Leadership, and Potential categories on an evaluation done by Jeff King ("J.King")[7]. Doc. 41-6. Mr. Freeman again received praise for his hard work and customer relations, but his review noted a need to develop holding others accountable and to communicate with management. *Id.*

H.   <u>Mr. Freeman's 2004 Employment and Alleged Discrimination By Dale George</u>

In January 2004, Mr. Freeman's supervisor in the millworks and special services departments, Jeffrey Melvin, also rated Mr. Freeman in the third-tier and

---

[6]At times in his deposition, Mr. Freeman claims that all of his evaluations subsequent to the Kahrig and Fowler write-ups reflected their bias because of his assumption that subsequent evaluators relied on old evaluations to assess each performance review. *See* Pl. Dep. 229:18 - 230:14, 290:1-9.

[7]Jeff King, a former member of the Air National Guard, replaced Brian Richardson as Mr. Freeman's store manager in June 2003. Doc. 41-15 ¶¶ 2-3.

noted similar positive traits (dependability, product knowledge, integrity) and areas for improvement (following shrink plan, sharing knowledge with others). Doc. 41-7.  Again, the third-tier "Potential" rating Mr. Freeman received was one level below "Promotable."  *Id.*  Mr. Freeman received identical third-tier ratings on his August 18, 2004, performance review for the special services department. Doc. 41-8.

Mr. Freeman's 2004 complaints center primarily on the alleged discriminatory conduct of Dale George ("George"), who replaced Melvin as Mr. Freeman's ASM on August 25, 2004.  Doc. 41-14 ¶6.  That fall, Defendant moved Mr. Freeman from special services to the freight team.  *See* Pl. Dep. 204:1 - 208:23; doc. 41-15.  Although Mr. Freeman did not oppose the transfer, he disliked it because the freight team worked overnight.  Pl. Dep. 162:1-12.  Mr. Freeman believes George transferred him, in part, because he witnessed George helping load a riding lawnmower into a customer's car before the customer paid for it, in violation of Home Depot policy.  *Id.*  Mr. Freeman told a co-worker to write down the license plate.  Pl. Dep. 160:9 - 161:17.  When the customer subsequently drove off without paying, George believed they could not pursue him.  *Id.*  Mr. Freeman, however, provided the license plate number to a Birmingham policeman, who served as store security, and the policeman

successfully contacted the customer and recovered the lawnmower.  *Id.*  According

to Mr. Freeman, George orchestrated the transfer so that Mr. Freeman could not

again prevent George from engaging in similar conduct.  *Id.*

From August to December 2004, Mr. Freeman worked under George's

direct supervision, *id.* 197:9-23, during which George discriminated against him

and made derogatory comments about his drill duty and the Iraq War.  *Id.* 33:2-12,

280:10-23.  In September 2004, George reversed "holiday pay" for Mr. Freeman

and two other employees, Greg Leonard ("Leonard") and John McGrew

("McGrew') (non-service members), but Mr. Freeman complained to Store

Manager Kevin Long, who reinstated the holiday pay.  Pl. Dep. 181:4 - 182:5.[8]

During his time with George, Mr. Freeman had to leave his overnight shift

two hours early once a month, at 4 a.m. instead of 6 a.m., to arrive at Saturday drill

duty on time.  *Id.* 33:2 - 34:2; 36:10-21.  Apparently, George "would get highly

upset", *id.* 33:4-9, and "would make comments about every time he looks around,

I'm going to drill" and even questioned whether Mr. Freeman actually attended the

drills.  *Id.* 197:3-20.  However, Defendant never cut Mr. Freeman's pay for leaving

---

[8]Mr. Freeman also testified that George resented Mr. Freeman's unwillingness to help
George discharge John McGrew, who dated the same female as George.  Pl. Dep. 184:2 - 187:23.
Mr. Freeman testified that "our working relationship between Dale George and myself was
tarnished from that point, because I would not do something that I thought was unethically right."
*Id.* 184:10-13.

early. *Id.* 196:9-15.

In November or December 2004, Mr. Freeman received a Warning Order, placing him on alert status for a likely deployment to Iraq. *Id.* 153:14 - 156:18. When Mr. Freeman informed George of his activation on December 7, George "was upset, because he did not support the war in Iraq," and told Mr. Freeman he would not hold a position open for Mr. Freeman. *Id.* 189:8-13, 30:6-10, 156:4-12, 157:13-20, 31:2-12.[9]

I.    2004 PIP and Probation

Less than 24 hours later, George and J.King placed Mr. Freeman on a ninety-day Performance Improvement Plan ("PIP"), even though Mr. Freeman received no disciplinary write-ups leading to the PIP. Doc. 41-9; Pl. Dep. 32:14:18, 157:21 - 158:9, 277:1-6.  Mr. Freeman's PIP stated as its basis:

> On numerous occasions Carl has been given tasks to complete that have been left undone.  Carl must work on his time management skills and getting his work objectives completed on a daily and weekly basis.  He must do this through delegation/follow-up and by training his associates to work efficiently.   Carl must show immediate and sustained improvement over the next 90 days to continue his employment with Home Depot.  Performance improvement plan begins 12/07/04 and ends 2/24/05.

---

[9]There is some dispute whether Mr. Freeman informed George on December 6 or 7, 2004, because Mr. Freeman worked the overnight shift spanning those two days and informed George at some point during that shift.

Doc. 41-9 at 1.  The PIP indicated the following key development needs: "Better

hand off ( get walked at end of shift); Manage overtime; Complete schedule

variance; Complete all pallets daily."  *Id.*  The performance review attached to the

PIP rated Mr. Freeman in the fourth of four tiers in the Overall Performance,

Leadership, and Potential categories.  *Id.* at 2.

    According to Mr. Freeman, the normal process for discipline involves

written warnings, then written counseling, and a final probation (PIP) or

termination.  Pl. Dep. 309:7-13.  However, Defendant never issued Mr. Freeman

any write-ups or reprimands prior to placing him on probation and did not inform

him of any problems with his conduct or the pallet count for the freight team.  *Id.*

39:9 - 40:11.  In fact, Mr. Freeman maintains his team "exceeded the pallet count."

*Id.* 40:7-13.

    Mr. Freeman attached comments to the PIP indicating that George placed

him on probation as retaliation,[10] but could not recall if he attributed the retaliation

to his military service, their disagreement over McGrew, or the riding lawnmower

incident.  *Id.* 210:15 - 212:1.  However, Mr. Freeman testified that George issued

_____

[10]Mr. Freeman testified that he typed and attached comments to the PIP the day after
receiving it, but the comments were never located or identified by either party in the course of
discovery and are, therefore, absent from the court's record.  Pl. Dep. 209:14 - 210:2; doc. 40
¶60, n.8.

the PIP to get back at him for "beating" George on the riding lawn mower and McGrew incidents.  *Id.* 211:5 - 212:1.

Mr. Freeman testified that he also met with J.King on December 7, 2004, to discuss the PIP.  *Id.* 209:12 - 210:2.  J.King confirmed that meeting, but claimed that he did not learn about the impending deployment until the following day. Doc. 41-15 ¶¶ 7-8.  Mr. Freeman concedes that he failed to mention the mobilization during the meeting and that he does not know whether J.King knew about it.  Pl. Dep. 225:4 - 226:11.

The day after the PIP, George interrupted a department meeting and confronted Mr. Freeman for discussing the impending deployment with his associates.  *Id.* 215:5 - 216:3.  Mr. Freeman informed J.King about this incident and George's animosity towards him, but attributed the animosity to the lawn mower incident and the disagreement over McGrew.  *Id.* 216:12-14, 220:12 - 221-13, 222:18 - 223:20, 224:11-16.

J.    Post-Deployment in 2005

On January 7, 2005, Mr. Freeman deployed to Iraq.  Pl. Dep. at 240:1-8, 20-23; Doc. 41-15 ¶8.  When he returned on November 15, 2005, Defendant assigned him as the millworks department supervisor.  Pl. Dep. 244:10-23, 257:12-15, 283:7-17.  Mr. Freeman had no trouble returning to work, *id.* 284:13 - 285:8,

especially since George and J.King no longer worked at store 880.  *Id.* at 243:5 - 244:1; Doc. 41-15. ¶9.  Mr. Freeman's hourly rate of pay remained $16.52.  Pl. Dep. 284:13-21, 285:14-16; doc. 41-13.  Mr. Freeman's 90-day PIP resumed with approximately 60 days remaining, Pl. Dep. 285:17-21; King Decl. ¶8, and, as a result, the Human Resources Manager informed him that he was not eligible for an annual pay increase.  Pl. Dep. 247:20 - 248:10.  Consequently, Mr. Freeman did not receive a pay increase in January 2006.  *Id.* 262:5-7.

Mr. Freeman also did not receive the sales bonus for 2005 his co-workers received in early 2006.  *Id.* 287:6-22.  Instead, he received a $50 bonus, while his co-workers purportedly received "a significant amount more."  *Id.* 287:6-22, 296:7-17.  Defendant offered the bonus to reward employees for exceeding their sales plan for 2005, *id.* 287:23 - 288:3, which Mr. Freeman contends he would have also received but for his deployment.  *Id.* 297:2-12.

On February 19, 2006, Mr. Freeman received third-tier ratings of "Performer" and "Acceptable," and a second-tier "Promotable" Potential rating. Doc. 41-12 at 53.  Mr. Freeman received these same ratings in August 2006.  *Id.* at 55.

At some point in early 2006, Mr. Freeman filed another complaint with the DOL, effectively reopening his prior complaint.  *Id.* 264:2-9, 285:22 - 286:6.  Mr.

18

Freeman informed the DOL that George retaliated against him for his pending

deployment, but failed to mention the other disagreements he and George shared.

*Id.* 286:18 - 287:5.  Mr. Freeman also informed the DOL that he believed

Defendant promoted less qualified employees over him because of the allegedly

discriminatory reviews he received previously.  *Id.* 267:6 - 268:9.  When asked to

clarify this contention in his deposition, Mr. Freeman related that he and Dax

Russell ("Russell") had similar qualifications at the Home Depot, and that even

though he outranked Russell in the Navy, Defendant promoted Russell instead of

him.  *Id.* 267:14 - 268:16.  However, Mr. Freeman conceded that he had no

knowledge of Russell's qualifications, but assumed that they had similar

qualifications because both served as Home Depot department supervisors.  *Id.*

268:20 - 270:11.  Mr. Freeman also testified that Defendant changed the

performance reviews of several other supervisors to make them eligible for the

promotions they eventually received and that he received no such special

treatment and was not promoted in 2006.  *Id.* 277:7 - 279:23.  Mr. Freeman

conceded though that he had no information to suggest Defendant would have

considered him for a promotion but for his probation.  *Id.* 346:12-16.

     K.    <u>2008 - 2009 Deployment</u>

In March 2008, Mr. Freeman received second-tier performance ratings on

his evaluation, ranking him as "Achiever," "Effective," and "Promotable."  Doc.

41-12 at 57.  Thereafter, Mr. Freeman filed this action on December 5, 2008.  Doc.

1.  That same month, or the month after, Mr. Freeman learned that the Navy

planned to deploy him again to Iraq.  *See* Pl. Dep. 329:20 - 330:6; docs. 7 and 8.

When Mr. Freeman returned from his deployment in October 2009, he resumed

working for Defendant.  Pl. Dep. 330:2-6.  Again, Mr. Freeman did not receive a

wage increase nor did he receive the same February 2009 bonus awarded to other

department supervisors for the 2008 sales year.  *Id.* 330:7 - 331:20.  Instead,

although Mr. Freeman worked for all of 2008 or until December 2008, Mr.

Freeman received only $50, whereas other supervisors received bonuses of

$1,200.  *Id.* 330:11-15; 329:16 - 331:20.  On April 1, 2010, Mr. Freeman filed his

Amended Complaint to include the wage increase and bonus denials from 2009.

Doc. 16.

Because Defendant has had the same district manager, Michael Cain, since

2001, Mr. Freeman believes he is still considered a "troubled associate" and that

the allegedly discriminatory conduct he experienced in 2001 continues to affect

his evaluations.  Pl. Dep. 289:20 - 290:9.  Moreover, Mr. Freeman believes that

the absence of any formal discipline or disciplinary statement regarding the "rogue

managers and violations" indicates that there is nothing stopping Defendant from

engaging in similar conduct in the future. *Id.* 348:12-20.

In his Amended Complaint, Mr. Freeman asserts the following:

[1] Defendant attempted to force him to choose between the military or employment with defendant shortly after September 11, 2001, World Trade center terrorist attacks.

[2] The Defendant attempted to deny him necessary time off to attend military drills.

[3] Defendant issued him disciplinary notices for missing work and attending military drills.

[4] Defendant retaliated against him because of seeking relief from harassment and discrimination for the Department of Labor.

[5] Defendant has denied him promotional opportunities based upon his military affiliation.

[6] Defendant placed him on probation when Mr. Freeman notified them that he was recalled to active duty in Iraq.

[7] Defendant denied him scheduled wage increases and bonuses upon his return from duty in Iraq twice.

Doc. 16 at ¶¶ 4-10.

### III. STATUTORY BACKGROUND

USERRA's purposes are threefold:

(1) to encourage noncareer service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service;

(2) to minimize the disruption to the lives or persons performing

> service in the uniformed services as well as to their employers,
> their fellow employees, and their communities, by providing for
> the prompt reemployment of such persons upon their completion
> of such service; and
>
> (3) to prohibit discrimination against persons because of their
> service in the uniformed services.

38 U.S.C. § 4301(a).  To accomplish these goals, USERRA protects a service

member's rights to reemployment,  the benefits of employment, and to non-

discrimination or retaliation based upon  membership in the armed services.  *See*

*id.* at §§ 4311-13, 4316.  "USERRA's right to re-employment encompasses two

guarantees that are embodied in §§ 4312 and 4313," which protect a veteran's

right to prompt reemployment in a statutorily satisfactory position.  *Fannin v.*

*United Space Alliance, LLC*, No. 6:08-cv-1315-Orl-DAB, 2009 WL 139878, at *4

(M.D. Fla. Jan. 20, 2009); *see also Coffman v. Chugach Support Servs., Inc.*, 411

F.3d 1231, 1234 (11th Cir. 2005); *Petty v. Metro. Gov't of Nashville-Davidson*

*Cnty.*, 538 F.3d 431, 440 (6th Cir. 2008).

Such protections are distinct from USERRA's additional prohibition on

discriminatory or retaliatory action.  *See* 4311(a) and (b); *see also Coffman*, 411

F.3d at 1234.  Section 4311 reads, in pertinent part:

> (a) A person who is a member of . . . a uniformed service shall not
> be denied initial employment, reemployment, retention in employment,
> promotion, or any benefit of employment by an employer on the basis

22

of that membership . . .

> (b) An employer may not discriminate in employment against or take adverse employment action against any person because such person (1) has taken an action to enforce a protection afforded any person under this chapter, (2) has testified or otherwise made a statement in or in connection with any proceeding under this chapter, (3) has assisted or otherwise participated in an investigation under this chapter, or (4) has exercised a right provided for in this chapter. . . .

> (c) An employer shall be considered to have engaged in action prohibited - -

> (1) under subsection (a), if the person's membership . . . is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership . . .; or

> (2) under subsection (b), if the person's [enumerated protected conduct] is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such person's [protected conduct.]

38 U.S.C. § 4311.

USERRA includes a specific definition for "benefit of employment":

> The term 'benefit', 'benefit of employment', or 'rights and benefits' means any advantage, profit, privilege, gain, status, account, or interest (including wages or salary for work performed) that accrues by reason of an employment contract or agreement or an employer policy, plan, or practice and includes rights and benefits under a pension plan, a health plan, an employee stock ownership plan, insurance coverage and awards, bonuses, severance pay, supplemental unemployment benefits, vacations, and the opportunity to select work hours or location of employment.

23

38 U.S.C. § 4303(2).

More specifically, USERRA explains what types of rights employers must afford to service members upon their reemployment:

> (a) A person who is reemployed under this chapter is entitled to the seniority and other rights and benefits determined by seniority that the person had on the date of the commencement of service in the uniformed services plus the additional seniority and rights and benefits that such person would have attained if the person had remained continuously employed.

38 U.S.C. § 4316(a).  Except for instances not relevant here, a person who is absent from a position of employment because of uniformed service is:

> (A) deemed to be on furlough or leave of absence while performing such service; and

> (B) entitled to such other rights and benefits not determined by seniority as are generally provided by the employer of the person to employees having similar seniority, status, and pay who are on furlough or leave of absence under a contract, agreement, policy, practice, or plan in effect at the commencement of such service or established while such person performs such service.

38 U.S.C. § 4316(b)(1).

## IV. ANALYSIS

With that legislative background in mind, the court now evaluates each of Mr. Freeman's asserted violations of USERRA.  The court addresses Defendant's motion with respect to timeliness and standing first, and then the underlying

substantive claims.  As explained below, the court grants Defendant's motion in part, but concludes that genuine issues of material fact remain on several of Mr. Freeman's claims.

     A. <u>Timeliness and Standing</u>

     *(i) None of Mr. Freeman's Claim are Time-Barred*

At the outset, Defendant asserts that many of Mr. Freeman's claims are barred for inexcusable delay under the general four-year federal statute of limitations, 28 U.S.C. § 1658, or under the equitable doctrine of laches.  Doc. 40 at 5 n.3.  The court disagrees because, by its express terms, USERRA expressly precludes the application of a statute of limitations: "If a person seeks to file a complaint or claim with . . . a Federal or State court under this chapter alleging a violation of this chapter, there *shall be no limit on the period* for filing the complaint or claim."  *See* 38 U.S.C. § 4327(b)  (emphasis added).  This court will not apply a time limitation where the legislation and Congressional intent instruct otherwise.  *Accord U.S. v. Ala. Dept. of Mental Health & Retardation*, No. 2:08-cv-1025-MEF, 2010 WL 3326704, at *8 (M.D. Ala. July 27, 2010) ("USERRA expressly provides that there is no limit on the period for filing a complaint under the statute.").  Because § 4327(b) became effective in October 2008, two months before Mr. Freeman filed his December 2008 complaint, Mr. Freeman is a person

who *sought to file a claim under USERRA* after the amendment and, therefore, to whom a statute of limitations cannot apply.

This case is distinct from those barring the retroactive application of § 4327(b) because Mr. Freeman filed it after § 4327(b)'s October 2008 enactment. *See generally Middleton v. City of Chicago*, 578 F.3d 655 (7th Cir. 2009) (rejecting a retroactive application of § 4327(b) in a case *filed before* the 2008 amendments); *see also Potts v. Howard Univ. Hosp.*, 623 F. Supp. 2d 68,72 (D.D.C. 2009) (*Potts II*) ("To determine whether a statute of limitations applies to the plaintiff's USERRA claim, the court must examine the version of the statute that applied *when the plaintiff filed suit*.") (emphasis added); *Hogan v. United Parcel Serv.*, 648 F. Supp. 2d 1128, 1137 (W.D. Mo. 2009) ("Under this amendment, any action filed after October 2008 would not be subject to a statute of limitations defense, regardless of when the relevant factual events occurred"); *but see Moore v. United Airlines, Inc.*, No. 10-cv-2100-WYD-CBS, 2011 WL 2144629, at *4-5 (D. Colo. May 31, 2011) (barring the plaintiff's claims based on the limitations period in effect when the claims accrued, even though plaintiff filed after the October 2008 amendment). The plain language of § 4327(b) makes the relevant time period the point at which the plaintiff sought to file and filed the complaint, not when the claims accrued.

Likewise, Defendant neither presented support for the application of a

laches theory where Congress explicitly denied a limitations period nor made the

requisite showing of undue prejudice necessary for a laches defense.  *See Ala.*

*Dept. of Mental Health*, 2010 WL 3326704 at *8 (rejecting an argument for laches

where the moving party provided no evidence of inexcusable delay or undue

prejudice to the defendant).  The court's conclusion here is in line with its desire

to "broadly construe[] [USERRA] in favor of its military beneficiaries."  *See Potts*

*v. Howard Univ. Hosp.*, 598 F. Supp. 2d 36, 39 (D.D.C. 2009) (*Potts I*).  Thus,

none of Mr. Freeman's claims, including those based on events in 2001, are

untimely.

### *(ii) Mr. Freeman Has Standing to Pursue 2001 Claims*

Defendant also moves for summary judgment on the 2001 claims – those

based primarily on the conduct of Kahrig and Fowler – on standing grounds.  Doc.

40 at 25.  Specifically, Defendant asserts that because Mr. Freeman eventually

received a pay increase and it ultimately terminated Kahrig and Fowler, Mr.

Freeman's claims are, therefore, not redressible.  *See Fla. State Conference of*

*N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1159 (11th Cir. 2008) (citation omitted)

(noting that "injury or threat of injury must likely be redressible" as a prong in the

constitutional standing analysis).  Defendant supports its assertion with citation to

27

*Dees v. Hyundai Motor Manufacturing Alabama, LLC*, 368 F. App'x 49, 52-53

(11th Cir. 2010) (*Dees III*), a case in which the Eleventh Circuit upheld the district

court's grant of summary judgment, in part, because the plaintiff lacked standing

to proceed under USERRA.  Notably, both the district court and the Eleventh

Circuit in *Dees* relied on the fact that the plaintiff no longer worked for the

defendant as a basis to find the lack of standing.  *See id.* at 53 ("Further, an

injunction requiring [the defendant] HHMA to comply with USERRA would not

benefit Dees as he is no longer an HHMA employee."); *see also Dees v. Hyundai*

*Motor Mfg. Alabama, LLC*, 605 F. Supp. 2d 1220,1229 (M.D. Ala. 2009) (*Dees II*)

("[B]ecause he is no longer working for HHMA, an injunction requiring HHMA

and MHA to comply with the provisions of USERRA would be of no benefit to

him.  In short, there is no relief the court can give Dees for the harassment he may

have suffered.").  Additionally, in *Dees*, the plaintiff conceded that he had suffered

no lost wages or benefits.  *See Dees III*, 368 F. App'x at 53; *Dees II*, 605 F. Supp.

2d at 1229.

Conversely, here, Mr. Freeman testified that Defendant improperly denied

him a pay raise, at least initially.  Pl. Dep. 62:7-13; doc. 41-13.  Mr. Freeman

further testified that the 2002 pay raise he ultimately secured was merit-based and

unrelated to the alleged discriminatory denial of a raise a month earlier.  *Id.* 91:7 -

93:14.  Moreover, Mr. Freeman is still employed by Defendant, *id.* 17:4-10,

meaning his harm is still redressible.  Furthermore, Mr. Freeman explained that he

is not satisfied with the DOL's  resolution of his 2001 complaint "because

[Defendant] never disciplined Kevin Kahrig nor Lonnie Fowler for their actions"

and "[b]ecause failure to discipline means that you condone the practice," Pl. Dep.

at 112:10-22, which at the very least support his basis for injunctive relief.

Indeed, Defendant presented no evidence connecting the termination of Fowler

and Kahrig or Mr. Freeman's subsequent pay raise to Mr. Freeman's claims of

discrimination.  Such facts distinguish this case from *Dees* and support Mr.

Freeman's standing to pursue all of his claims.

    C. <u>USERRA Analysis Generally</u>

    As described above, USERRA's provisions protect a veteran's rights to

reemployment, to certain benefits of that employment, and to be free of

discrimination.  Sections 4312 and 4313 protect the rights to reemployment, as

further protected in section 4316, by ensuring prompt reemployment at a level that

satisfies USERRA's statutory requirements.  To show a violation of these sections,

an employee need only demonstrate a violation of USERRA's specific

prohibitions.  *See, e.g.*, *Petty*, 538 F.3d at 440.

    On the other hand, Section 4311 prohibits employment discrimination and

retaliation on the basis of military service.  *Coffman*, 411 F.3d at 1234.  Section

4311specifically prohibits an employer from denying any benefit of employment

to a member of the uniformed services on the basis of his military obligation.  §

4311(a), (c)(1).  To maintain an action for discrimination and retaliation, "Section

4311 clearly mandates proof of discriminatory motive."  *Coffman*, 411 F.3d 1238.

In USERRA cases, courts use the burden-shifting framework presented in *NLRB v.*

*Transportation Management Corp.*, 462 U.S. 393 (1983), to determine whether an

employer took an improper adverse action.  *See Sanguinetti v. United Parcel Serv.,*

*Inc.*, 114 F. Supp. 2d 1313, 1318 (S.D. Fla. 2000) (citation omitted), *aff'd*, 254

F.3d 75 (11th Cir. 2001) (table).

A plaintiff establishes a prima facie case of discrimination if he can "show

by a preponderance of the evidence that his protected status was a motivating

factor in [the] decision . . . ."  *Coffman*, 411 F.3d at 1238.  "A motivating factor

does not mean that it had to be the sole cause of the employment action.  Instead, it

is one of the factors that a truthful employer would list if asked for the reasons for

its decision."  *Id.* (internal citation and quotation marks omitted).  In other words,

"military status is a motivating factor if the defendant relied on, took into account,

considered, or conditioned its decision on that consideration."  *Id.*  Because

"discrimination is seldom open or notorious," a court may rely upon circumstantial

30

evidence, and "can infer discriminatory motivation under USERRA from a variety

of considerations, such as:

> proximity in time between the employee's military activity and the
> adverse employment action, inconsistencies between the proferred
> reason and other actions of the employer, an employer's expressed
> hostility towards members protected by statute together with knowledge
> of the employee's military activity, and disparate treatment of certain
> employees compared to other employees with similar work records or
> offenses."

*Id.*; *see also Dees III*, 368 F. App'x at 51 (quoting the same).

"When the employee has met this burden, the burden shifts to the employer

to prove the affirmative defense that legitimate reasons, standing alone, would

have induced the employer to take the same adverse action," which the employer

must prove by a preponderance of the evidence.  *Coffman*, 411 F.3d at 1238-39;

*see also Sheehan*, 240 F.3d at 1014.  Thus, unlike the *McDonnell Douglas*

framework employed in Title VII cases, "the procedural framework and

evidentiary burdens set out in [USERRA] shift the burden of persuasion, as well as

production, to the employer."  *Maxfield v. Cintas Corp.*, 427 F.3d 544, 551 (8th

Cir. 2005) (internal citation and quotation marks omitted); *see also Sheehan*, 240

F.3d at 1014 (distinguishing USERRA's burden-shifting framework because

"*McDonnell Douglas*, while allocating the burden of production of evidence, does

not shift the burden of persuasion to the employer . . . .").  "This burden-shifting

framework applies in both so-called 'dual motive' cases and so-called 'pretext'

cases." *Coffman*, 411 F.3d at 1239 (internal quotation marks and citation

omitted).  Thus, USERRA actions require "an initial showing by the employee that

military status was at least a motivating or substantial factor in the [adverse

action], upon which [the defendant] must prove, by a preponderance of evidence,

that the action would have been taken despite the protected status." *Id.* (internal

quotation marks and citation omitted).

    D. <u>Adverse Employment Actions</u>

    As discussed above, USERRA prohibits improper denial of reemployment

and discrimination.  *See* 38 U.S.C. §§ 4311-13, 4316.  Mr. Freeman proceeds *pro*

*se*, and, as a result, the court endeavors to liberally construe his claims.  *See Alba*,

517 F.3d at 1252 (citation omitted).  As best the court can tell, Mr. Freeman

alleges 12 bases for a USERRA violation: (1) failure to promote in 2001 because

of computer tampering; (2) harassment by Kahrig and Fowler in 2001 based on

their comments and changing his schedule to create conflicts with his drills; (3)

three write-ups and a final warning of termination in 2001 for missing work due to

attending mandatory drills; (4) denial of a wage increase in 2002; (5) harassment

by George in 2004 based on derogatory comments and a confrontation with

Plaintiff; (6) negative review and PIP in December 2004; (7) reductions in the

workforce for each department Mr. Freeman oversaw in 2002, 2003, and 2004; (8) denial of wage increase in 2006; (9) denial of bonus in 2006; (10) denial of promotion in 2006; (11) denial of wage increase in 2009; and (12) denial of bonus in 2009.  These actions allegedly support Mr. Freeman's denial of benefits, retaliation, and harassment claims.

The court organizes its analysis by grouping Mr. Freeman's claims based on the alleged conduct and date of occurrence.  Because Mr. Freeman admits that Defendant rehired him without delay each time he returned from active duty, *see, e.g.*, Pl. Dep. 284:13 - -285:8, only the propriety, and not the promptness, of Defendant's actions is in question.  Thus, the court considers Mr. Freeman's factual allegations – that Defendant improperly denied him promotions, pay raises, and wage increases and otherwise subjected him to mistreatment – to determine whether his claims for denial of proper reemployment, retaliation and discrimination, and harassment survive summary judgment.

*(i) Harassment or Hostile Work Environment Claim*

a. <u>USERRA Supports a Harassment and Hostile Work Environment Claim</u>

Mr. Freeman asserts that Defendant harassed him and subjected him to a hostile work environment.  Defendant contends that it is due summary judgment on this claim because USERRA does not prohibit harassment or create an action

33

for a hostile environment.  Doc. 40 at 33-34.  The court disagrees.

USERRA prohibits the denial of "any benefit of employment."  38 U.S.C. § 4311(a).  However, this circuit has "not yet resolved whether freedom from harassment properly constitutes a 'benefit of employment' under the statute." *Dees II*, 605 F. Supp. at 1226; *see Dees III*, 368 F. App'x at 53 ("Assuming without deciding that harassment or hostile work environment is a cognizable claim under USERRA, Dees lacks standing to bring such a claim.").  Nonetheless, many courts have concluded that workplace harassment is cognizable under USERRA.  *See Conners v. Billerica Police Dept.*, 679 F. Supp.2d 218, 227 (D. Mass. 2010) ("[T]he numerous courts that have had the opportunity to do so have uniformly determined that a cause of action lies under a theory of hostile environment analogous to the one authorized by Title VII.") (collecting cases). *But see Carder v. Continental Airlines, Inc.*, 636 F.3d 172, 179-183 (5th Cir. 2011) (interpreting legislative history to distinguish "benefits of employment," which it viewed as purely contractual, from "terms, conditions, or privileges of employment," and holding that "service members may not bring a freestanding cause of action for hostile work environment" under USERRA);[11] *Baerga-Castro*

---

[11]In *Carder*, the Fifth Circuit concluded that the purpose underlying USERRA is "to encourage people to join the reserves," and noted that "[t]here is simply little evidence that employers harbor a negative stereotype about military service or that Congress believes they do."

*v. Wyeth Pharm.*, No. 08-1014(GAG/JA), 2009 WL 2871148, at *12 (D.P.R. Sept. 3, 2009) (concluding without analysis that because USERRA does not specifically prohibit an employer from subjecting an employee to harassment or a hostile work environment, such claims are not cognizable under USERRA).

In *Petersen v. Department of Interior*, 71 M.S.P.R. 227 (1996), the Merit Systems Protection Board ("MSPB") concluded that harassment based on military service violated USERRA. *Id.* at 239. The MSPB analyzed USERRA's legislative history and compared USERRA's language to other civil rights and employment laws and noted that courts have found these laws support hostile environment claims. *See Petersen*, 71 M.S.P.R. at 238-39. As a result, the MSPB concluded:

> Based on the broad interpretation that Congress intended be given to USERRA and to the well-established principle that discrimination encompasses hostile environment claims, we conclude that harassment on account of prior service in the uniformed services, which is sufficiently pervasive to alter the conditions of employment and create an abusive working environment, is a violation of 38 U.S.C. § 4311(a).

*Id.* at 239.

Notably, in *Dees II*, Judge Myron H. Thompson of our sister court in the

---

636 F.3d at 179 (internal quotation marks omitted) (citing *Velasquez v. Frapwell*, 160 F.3d 389, 392 (7th Cir. 1998). In short, the Fifth Circuit concluded that freedom from harassment and a hostile work environment was not the type of "benefit of employment" Congress sought to protect. *See id.* This court disagrees, and, instead, is persuaded by the analysis in *Dees II*, *Vickers*, and *Petersen*, *infra*.

Middle District of Alabama found a USERRA harassment claim cognizable: "The court agrees with *Petersen*'s logic and, in the absence of Eleventh Circuit precedent to the contrary, concludes that a claim for harassment on account of military service is cognizable under USERRA." *Dees II*, 605 F. Supp. 2d at 1227. Judge Thompson pointed out that "harassment is cognizable under other anti-discrimination statutes, and USERRA is intended to be construed broadly for the benefit of returning veterans." *Id.* Judge Thompson found further support for his conclusion given the rising dependence within our military on non-career service members and the National Guard. *See id.* at 1228.

Similarly, in *Vickers v. City of Memphis*, 368 F. Supp. 2d 842 (W.D. Tenn. 2005), Chief Judge Jon P. McCalla concluded that USERRA supported an action for harassment. *Id.* at 845. In *Vickers*, the court followed *Monroe v. Standard Oil Co.*, 613 F.2d 641 (6th Cir. 2010), in which the Sixth Circuit construed USERRA's precursor statute and concluded that despite the intentional breadth of the statute, the precursor statute only protected the employment benefits that a reservist can show existed at his place of employment and, therefore, courts must ascertain harassment or a hostile work environment with reference to that specific employer's rules, policies, and practices. *Vickers*, 368 F. Supp. 2d at 845 (citing *Monroe*, 613 F.2d at 645). Noting USERRA's specific protection of "benefits of

36

employment," the *Vickers* court concluded that "Plaintiff's claims of harassment and hostile work environment under USERRA may therefore proceed if he can establish the existence of an employment policy that prohibits the type of conduct about which he complains." *Vickers*, 368 F. Supp. 2d at 845. Likewise, citing to *Petersen*, the *Vickers* court concluded that USERRA provides a cause of action for harassment, subject to the plaintiff establishing the pervasiveness and severity of the conduct and that she "is entitled to such a benefit of employment by virtue of an employer policy." *Id.*

Conversely, Defendant asserts that USERRA's legislative purpose does not support a harassment claim because Congress passed USERRA "only 'to encourage people to join' the armed services," doc. 40 at 34 (quoting *Velasquez v. Frapwell*, 160 F.3d 389, 392 (7th Cir. 1998)), and notes that "USERRA's primary focus is not on negative opinions of certain groups, but on the reality that employers may not want to hire employees who, as members of the armed services, could frequently be absent for long periods of time," doc. 40 at 34 (quoting *Dees* (*Dees I*), 524 F. Supp. 2d at 1351 (M.D. Ala. 2007), *aff'd*, 368 F. App'x 49 (11th Cir. 2010)).

This court disagrees that USERRA's goal is so limited and frankly does not see how Congress can accomplish its goal of encouraging people to join the armed

37

forces if, as Defendant maintains, the same statute permits employers to harass

employees for joining the military.  Indeed, Congress specifically stated as its

purpose, among others,"to prohibit discrimination against persons because of their

service in the uniformed services," § 4301(a)(3), which is broad enough to include

a prohibition against harassment.  Therefore, the court agrees with the analysis in

*Dees II* and *Petersen* and will follow the line of cases interpreting USERRA

similarly to other legislative prohibitions on discrimination, namely Title VII,

which support a claim for harassment.  *See Conners*, 679 F. Supp. 2d at 227

(citing cases).[12]  As Judge Thompson aptly stated, "An assurance that employees

cannot be fired on account of their military service is meaningless without

assurance that the work environment will not be so intolerable that they will feel

forced to quit."  *Dees II*, 605 F. Supp. 2d at 1227-28.  Accordingly, the court

concludes USERRA supports a cause of action for harassment and hostile

environment.

Alternatively, even under the more restrictive *Vickers* approach, i.e. that Mr.

---

[12]Additional courts have found a USERRA-harassment claim viable.  *See Maher v. City of Chicago*, 406 F. Supp. 2d 1006, 1023 (N.D. Ill. 2006) ("Harassment on account of prior military service can be a violation of USERRA."); *Steenken v. Campbell Cnty.*, No. 04-224-DLB, 2007 WL 837173, at *3 (E.D. Ky. Mar. 15, 2007) ("Because the right to be free from a hostile work environment, broadly construed, is a benefit of employment, the Court, in the absence of Sixth Circuit authority to the contrary, concluded Plaintiff's hostile work environment claim is cognizable under USERRA.").

Freeman must demonstrate that Defendant specifically promised protection from harassment or discrimination as a benefit of employment, here, based on Defendant's Code of Conduct and corporate policies, doc. 41-3, the harassment claims still survive.  Defendant's employment policies prohibit discrimination or harassment in violation of "characteristics protected by applicable law,"[13] and probably why it concedes essentially that its policy prohibiting discrimination and harassment includes some of the conduct of which Mr. Freeman complains.  *See* doc. 40 ¶¶ 5-7, 17, 27-29.  Therefore, the court concludes that Defendant's employment policies and code of conduct support a finding here that Mr. Freeman can pursue his harassment and hostile environment claims.

In sum, in light of Congress's purpose and the need to construe remedial statutes broadly, this court rejects Defendant's contention that USERRA does not support a claim of harassment, particularly where, as here, Defendant's policies promise freedom from unlawful discrimination.

    b. <u>Mr. Freeman's Hostile Work Claim Survives Summary Judgment</u>

Turning now to the actual merits of Mr. Freeman's hostile work environment claims, the court notes that "USERRA-harassment claims, like those

---

[13]The court notes the following disclaimer in the Code of Conduct policy: "This Code of Conduct does not create a contract between The Home Depot and any of its associates.  No promise of any kind is made by The Home Depot in this Code of Conduct."  Doc. 41-3 at 2.

under Title VII, should be analyzed using the principle announced by the Supreme

Court in *Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986)." *Dees II*, 605 F.

Supp. 2d at 1228.  Thus, "harassment is actionable when it is 'sufficiently severe

or pervasive to alter conditions of [the victim's] employment and create an abusive

working environment.'"  *Id.* (quoting *Meritor Savings*, 477 U.S. at 67); *see also*

*Maher*, 406 F. Supp. 2d at 1023 (applying the *Meritor* analysis in a USERRA-

harassment case).  The plaintiff must subjectively perceive the harassment as

severe and pervasive and that perception must be objectively reasonable.

*Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc).  To

assess the objective reasonableness of the alleged harassment, the court considers

"frequency of the discriminatory conduct; its severity; whether it is physically

threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with an employee's work performance."  *See Dees II*, 605

F. Supp. 2d at 1228 (quoting *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 647 (11th

Cir. 1997)).  However, isolated comments and pressure to leave the military may

be insufficient to alter an employee's terms and condition of employment.  *See*

*Miller v. City of Indianapolis*, No. IP-99-1735-CMS, 2001 WL 406346, at *8

(S.D. Ind. Apr. 13, 2001).

  Here, Mr. Freeman identified several instances he believes constitute

harassment.  Specifically, in 2001, his supervisors told him he "needed to choose between Home Depot and the military," told him they would "help . . . make that choice" and changed his work schedule to conflict with his military duty weekends on three consecutive months, told him the military was "part-time" and that Defendant was his "full-time," and disciplined and eventually issued a notice of final termination for missing scheduled work to attend mandatory drills.  Pl. Dep.41:13 - 47:11.  These actions prompted Mr. Freeman to complain to the DOL. *See* Doc. 41-16.  Moreover, while Mr. Freeman never quit, he complained to his District Manager and to his new store manager even after the termination of the offending supervisors, evidencing his perception of the severity and bothersome nature of such treatment.  Pl. Dep.  47:17 - 49:13, 90:9 - 91:6.  Because the supervisors specifically mentioned drill duty and allegedly changed his schedule to make sure it conflicted with his drills, a jury could infer that such treatment, if it occurred, constituted sufficiently severe or pervasive conduct to support a harassment or hostile work environment claim.  *See Dees II*, 605 F. Supp. 2d at 1228 (finding genuine issues of material fact as to the hostility of the work environment based on the employer's insistence that the plaintiff put his civilian job ahead of military service); *see also Mendoza*, 195 F.3d at 1246 (noting the need for the perceived harassment to be objectively reasonable).

Notably, Defendant offers no argument to the contrary nor any evidence that Mr. Freeman's harassment was not sufficiently severe.  Indeed, Defendant "accepts [Mr. Freeman's] claims about Kahrig's discriminatory statements and actions in 2001," but asserts that "when corporate management learned of these actions they were reversed" and that "Kahrig was later fired."  Doc. 40 at 27 n.15. Thus, Defendant concedes the discriminatory conduct, but claims, without evidence, that the subsequent terminations of Kahrig, as well as Fowler, and Mr. Freeman's pay increase were related to Mr. Freeman's treatment or remedied that conduct.  *Id.*  Likewise, Defendant does not dispute that Mr. Freeman did not receive an apology or acknowledgment of the mistreatment from one of its corporate representatives.  Instead, Defendant relies upon the existence of its anti-discrimination policies – and points to Mr. Freeman's failure to invoke those mechanisms. However, Mr. Freeman's choice to complain to the DOL and to Defendant's District Manager or his new Store Manager, instead of Defendant's hotline, in no way indicates Mr. Freeman abandoned or waived his claim, nor does it automatically exonerate Defendant's District Manager and Store Manager from addressing Mr. Freeman's complaints.

In any event, in light of the frequency of the threats and comments, the issuance of a termination notice, and Mr. Freeman's poor performance review

subsequent to his DOL complaint, a reasonable jury could find that the harassment and environment Mr. Freeman faced was sufficiently pervasive and severe to alter the conditions of his employment.[14]   Accordingly, summary judgment is denied as to Mr. Freeman's harassment claim.

### (ii) Denial of Wage Increases and Bonuses

Mr. Freeman alleges, at best, three improper denials of wage increases or bonuses in 2002, 2005, and 2009: (1) that he did not receive a pay raise in January 2002 because of a discriminatory negative reviews; (2) that because Defendant improperly placed him on PIP, he did not receive a raise or the same size sales bonus when he returned from his 2005 deployment; and (3) that Defendant did not award him a pay raise or a bonus similar to other employees when he returned from deployment in 2009.  *See* doc. 16 at 2; Pl. Dep. 62:7-13, 287:6-22, 330:7 - 331:20.[15]  As shown below, Mr. Freeman failed to meet his burden on these claims

---

[14]As the court addressed above, Mr. Freeman has standing to pursue this claim despite his DOL complaint in 2002.  *See supra* IV.A.*(ii)*.

[15]Somewhat confusingly, Mr. Freeman asserts that the denial of wage increases and bonuses, as well as the allegedly discriminatory reviews, constitute actionable claims under USERRA.  Instead, the court distinguishes between Mr. Freeman's claims based on denial of pay raises and bonuses from Mr. Freeman's assertion that his performance reviews were discriminatory.  "[A] poor evaluation, if it prevents a raise, denies a benefit of employment," and thus is actionable under USERRA.  *See Harris v. City of Montgomery*, 322 F. Supp. 2d 1319, 1324 (M.D. Ala. 2004) (citing *Yates v. Merit Sys. Prot. Bd.*, 145 F.3d 1480, 1485 (Fed. Cir. 1998)).  Thus, the performance review, and not the subsequent denial of a merit-based raise or bonus, constitutes the action evidencing discriminatory animus.  *See Harris*, 322 F. Supp. 2d at 1326 (analyzing the poor performance review, which led to denial of a merit-based raise, as

and, accordingly, summary judgment is warranted.

Section 4316 of USERRA protects the rights, benefits, and obligations of employees absent from employment due to uniformed services. For example, a returning employee "is entitled to the seniority and other rights and benefits determined by seniority" that the employee had or would have attained during his service had he remained an employee. *See* 38 U.S.C. § 4316(a). Additionally, the employee is "entitled to such other rights and benefits not determined by seniority as are generally provided by the employer of the person to employees having similar seniority, status, and pay who are on furlough or leave of absence." § 4316(b)(1)(B).

Importantly, Mr. Freeman bears the burden of presenting some evidence to support his assertion that a wage raise or bonus is a seniority-based benefit or to show that the benefit is one that the Defendant ordinarily affords to other employees on comparable leave. *See Tully v. Dept. of Justice*, 481 F.3d 1367, 1369 (Fed. Cir. 2007) (requiring plaintiff to show "not any leave of absence, but rather one comparable to the leave provided to the service member for military

---

evidence of retaliation or discrimination under USERRA). A denial of pay raises or bonuses to a returning veteran only evidences discriminatory animus itself where such raises are based on seniority or are otherwise afforded to employees on non-military leaves of absence. *See* § 4316(a) and (b).

44

service" to demonstrate the availability of benefits).  If a plaintiff cannot show that a similar leave of absence for non-military reasons would result in accrual of the benefits in question, then the plaintiff cannot make out his prima facie case with respect to those benefits.  *See id.* at 1370 (rejecting plaintiff's claim because he had "not shown that if he had taken a leave of absence from the [employer] for two and a half years for reasons other than military service the [employer] would have paid his salary for that entire period").  "To assure equal but not preferential treatment, the benefits sought by a service member must be compared with benefits associated with absences similar to the service member's." *Id.*

Mr. Freeman's failure to offer any evidence that the wage raises are seniority based, especially in light of the evidence to the contrary, Doc. 41-14 ¶ 9, highlights the fact that he has no support for the assertion.  Significantly, Mr. Freeman concedes that the denial of pay raises resulted from his poor performance reviews, indicating raises are based on merit rather than on seniority.  *See* Pl. Dep. 62:7-13, 262:5-7, 287:6-22.  Indeed, Defendant offered a summary of Mr. Freeman's pay scale since his employment that showed several wage increases from $10.50 per hour in 1996 to $18.36 in March 2010, doc. 41-13, all of which occurred while Mr. Freeman served in the Navy Reserves and suggests that Defendant clearly has shown a willingness to award him pay raises despite his

45

military status.  *See* Pl. Dep. 20:8-12; doc. 41-13.  Moreover, the summary of Mr.

Freeman's pay scale also does not show any regularity, supporting Defendant's

assertion that the pay raises are not uniformly calendared or based solely on

seniority.  *See* doc. 41-13.

Similarly, Mr. Freeman admits Defendant's Human Resources Manager

informed him in 2005 that any employee on a PIP is ineligible for a pay raise.  Pl.

Dep. 247:20 - 248:10; *see also* Doc. 41-14 ¶12.  Mr. Freeman offers no evidence

to contradict that assertion.  Likewise, Mr. Freeman bases his claim regarding

wage increases and bonuses in 2009 on mere speculation, as he assumes everyone

else received a larger bonus and a wage increase because Defendant "boast[ed]

about being one of the few companies in this [sic] terrible economic times that

gives wage increases."  Doc. 41-1, Pl.'s dep. 331: 11-17.

Even if other employees received larger bonuses than Mr. Freeman while he

was overseas, Mr. Freeman's claim fails because he admits that Defendant awards

bonus payments for above-average sales, not seniority.  Pl. Dep. 287:6-22, 296:7-

17.  Mr. Freeman received a $50 bonus after his 2005 and 2009 deployments but

believes, despite his absence for a significant portion of each calendar year, that

he is due the full sales bonus and asserts that he would have received the same

sales bonus as other associates but for his deployment.[16]  *Id.* 287:6-22, 297:2-12,

330:7 - 331:20.  Sadly, Mr. Freeman offers no evidence showing that Defendant

awarded the bonuses based on seniority, nor does Mr. Freeman identify any

employee who received a larger bonus than him despite a comparable non-military

absence from work.  Indeed, Mr. Freeman's own testimony supports the

conclusion that Defendant awarded him a $50 bonus in 2005 and 2009 to

compensate him proportionally for his part in the above-average performance of

his department in those years.

In any event, the burden is on Mr. Freeman to provide evidence of

entitlement to the benefits Defendant allegedly denied him, either based on

seniority or because other non-military employees received such benefits when on

comparable leave.  *See Tully*, 481 F.3d at 1369-70.  Mr. Freeman failed to meet his

burden, and, accordingly, the court grants summary judgment on his wage and

bonus claims.  *See Mullins v. Goodman Distrib., Inc.*, F. Supp. 2d 782, 790 (S.D.

Ohio 2010) ("In the absence of any evidence or argument from Plaintiff that

[Defendant] has given raises to employees who were on leave for reasons other

than their service in the military, this Court is compelled to conclude that the

---

[16]Mr. Freeman does not know what bonuses other employees received for 2005, but for 2009, other associates received bonuses upwards of $1,200.  Doc. 41-1. Pl.'s Dep. 269:7-17; 296:7-17.

Defendant did not violate the USERRA . . . .").

*(iii) Failure to Promote in 2001 and 2006*

Mr. Freeman asserts that in 2001 and 2006, and perhaps other times during his employment, Defendant overlooked him for promotions, presumably because of animus towards his military status.  His claims appear to blend his assertion that a negative review constitutes retaliation and a denial of benefits, with a claim that, based on seniority alone, Defendant should have promoted or rehired him into a better position.[17]

Additionally, Mr. Freeman may intend to show that Defendant's failure to promote him over time, as opposed to its failure to automatically promote him upon reemployment, constitutes its own evidence of discrimination under § 4311. Indeed, Mr. Freeman's complaint and subsequent deposition testimony make clear his belief that (1) his performance ratings were based upon and infused with improper discriminatory animus, Pl. Dep. 229:18 - 230:14, and (2) his supervisors improperly removed his name from the promotional opportunities database in

---

[17]As with Mr. Freeman's wage increase claims that relied upon negative reviews, to the extent that the negative reviews were motivated by Mr. Freeman's military conduct, they constitute their own denials of employment benefits and their own violations of USERRA.  Here, the court considers only the failure to promote as a violation in and of itself.  *See supra* n.12.

2001, Pl. Dep. 334:20 - 228:19; doc. 41-16 at 5.[18]

The regulations accompanying USERRA explain an employer's duty to hire a returning veteran into an appropriate position:

> As a general rule, the employee is entitled to reemployment in the job position that he or she would have attained with reasonable certainty if not for the absence due to uniformed service. This position is known as the escalator position . . . . The escalator principle requires that the employee be reemployed in a position that reflects with reasonable certainty the pay, benefits, seniority, and other job prerequisites, that he or she would have attained if not for the period of service.

20 C.F.R. § 1002.191. In other words, "the returning veteran should step back onto the seniority escalator" at the "precise point he would have occupied had he kept his position continuously during the [deployment]." *Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U.S. 275, 284-85 (1946).

On the other hand, "[i]f a promotion is at least partially dependent on the employer's discretionary determination of fitness and ability, [USERRA] does not accord the veteran a right to an automatic promotion." *Fannin*, 2009 WL 139878, at *8 (quoting *Goggin v. St. Louis*, 702 F.2d 698, 701 (8th Cir. 1983)). Thus, "a

---

[18]However, Mr. Freeman points to no evidence that Defendant would have or should have selected him for a promotion if his name was available in the computer database. Pl. Dep. 338:14-19. Similarly, Mr. Freeman presents no evidence, and admits he has none, demonstrating that Defendant would have or should have chosen him for a promotion had it given him superior performance ratings or never placed him on probation. Pl. Dep. 346: 12-16. Instead, he relies almost exclusively on assumptions without substantive evidence. Id. 230:1-8; 290:1-9. Therefore, to the extent Mr. Freeman makes a separate claim for Defendant's failure to promote him over time, such a claim fails.

veteran is *not* entitled to demand that he be assigned a position higher than that he formerly held when promotion to such a position depends, not simply on seniority or some other form of automatic progression, but on the exercise of discretion on the part of the employer." *Id.* (quoting *McKinney v. Missouri-Kansas-Texas R.R. Co.*, 357 U.S. 265, 272 (1958)).

Defendant asserts that its selection of candidates for promotion is based primarily on performance reviews and that "there are no automatic promotions at the managerial level." Doc. 41-14 ¶ 8.  Defendant asserts further that Mr. Freeman has no evidence it bypassed him improperly and maintains that it selected others for promotions based on their superior performance reviews.  Doc. 40 at 31.

Notably, Mr. Freeman's performance evaluations frequently rated him in the third-tier, of the promotion "Potential" scale.  Significantly, Mr. Freeman acknowledged that an employee needs a rating in the first or second-tier on the "Potential" scale to be eligible for a promotion.  Pl. Dep. 277:7 - 279:23.  Even more damaging, Mr. Freeman testified that supervisors who he did not believe discriminated against him rated him also in the third-tier of the "Potential" scale. *See* Pl. Dep. 127:3-5; doc. 41-4; doc. 41-5.  One of these supervisors is J.King, doc. 41-16;  Doc. 41-15 ¶3, who served in the Air National Guard and is also a member of the same protected class.  While Mr. Freeman believes that these

supervisors rated him poorly because they relied on earlier discriminatory ratings of other supervisors, he has no evidence to support this contention.

Furthermore, to support his contention Mr. Freeman noted that Defendant promoted another service member, Russell, even though Mr. Freeman out-ranked Russell rank in the Navy.  Pl. Dep. 2267:14 - 268:16.  Mr. Freeman believed the promotion of Russell, who held the same Home Depot position, demonstrated Defendant's prejudice against Mr. Freeman, in part, because Defendant specifically cited Russell's naval leadership as a basis for his promotion.  *Id.* Unfortunately for Mr. Freeman, rather than helping him prove his case, the promotions of other members of the protected class like Russell and, particularly, J.King, who supervised Mr. Freeman, bolster Defendant's claim that it awards promotions to military service members and nonservice members alike. *See* doc. 40 at 30; *see also Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1471 (11th Cir. 1991) (noting the difficulty for plaintiff to establish discrimination when one of the allegedly discriminatory decision-makers is a member of the same protected class as the plaintiff).[19]  Moreover, Mr. Freeman's belief that Defendant promoted

_____

[19]The court agrees that "[t]he proposition that people in a protected category cannot discriminate against their fellow class members is patently untenable." *See Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 55 (2d Cir. 1998).  Similarly, the court posits that some employers may discriminate against reservists more than former military members because of the more frequent duty requirements of reservists.  However, here, Mr. Freeman's lack of substantial evidence coupled with the evidence of Defendant's promotion of other miliary service members cuts

Russell, in part, because of Russell's Navy reserve service negates the likelihood of anti-military animus, especially where J.King supervised Mr. Freeman's work and is one of the persons who rated Mr. Freeman as non-promotable.

Thus, the court is left with only Mr. Freeman's conclusory allegations that (1) he was entitled to a promotion and (2) did not receive one because of discrimination. This, however, is insufficient to meet Mr. Freeman's burden because "[c]onclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered . . . extensive evidence of legitimate, non-discriminatory reasons for its actions." *Carter v. City of Miami*, 870 F.2d 578, 585 (11th Cir. 1989). *Compare Mullins v. Goodman Distrib., Inc.*, 694 F. Supp. 2d 782,784, 787-88 (S.D. Ohio 2010) (denying summary judgment on plaintiff's failure to promote claim where plaintiff testified that his supervisor told him "he would have been given the [promotion] if he had not been gone for such a long time, referring to his employment in Iraq"). Likewise, Mr. Freeman's promotion claim fails also because he offers no evidence that the store manager position he believes he deserved qualifies as an "escalator position" under USERRA. In fact , the court concludes it does not. *See Fannin*, 2009 WL 139878, at *8.

---

against an inference of discrimination.

52

A plaintiff is required to "show evidence of discrimination other than the fact of non-selection and membership in the protected class." *Sheehan v. Dept. of Navy*, 240 F.3d 1009, 1015 (Fed. Cir. 2001).  Mr. Freeman's personal belief that he was more qualified than Russell, as well as others, is insufficient evidence of discrimination to prevent summary judgment.  *Vega-Colon v. Wyeth Pharm.*, 625 F.3d 22, 28 (1st Cir. 2010) (affirming summary judgment on the plaintiff's failure to promote claim because his "subjective belief [was] insufficient" because he "essentially rel[ied] only on his personal belief that he was more qualified").  In short, Mr. Freeman failed to present sufficient evidence, circumstantial or otherwise, to allow this court to infer discrimination or to determine that he was due an automatic promotion.  *See Coffman*, 411 F.3d at 1238.  Accordingly, summary judgment is due on the promotion claim.

### (iv) Discrimination and Retaliation Based On Poor Performance Reviews, Write-ups, and Probation

In his claims regarding both 2001 and 2004 conduct, Mr. Freeman fails to distinguish between his retaliation and discrimination claims with respect to the reviews, write-ups, and probation.  Nonetheless, courts follow the same analysis for both retaliation and discrimination claims pursuant to § 4311.

To determine whether Mr. Freeman's claims are actionable, the court must

first determine whether a negative performance review, probation, and write-ups constitute denial of a benefit of employment under §4311(a) and § 4303(2).  It is undisputed that the performance evaluations and PIP affected Mr. Freeman's eligibility for pay raises and promotions and that a PIP may lead to termination. Therefore, construing USERRA's definition of "benefit of employment" in § 4303(2) broadly, the court agrees that Mr. Freeman raised an actionable claim. *See Vega-Colon*, 625 F.3d at 28 (finding poor performance reviews and placement on a PIP actionable because "the ability to seek additional employment within the company, and the freedom from the threat of discipline or termination based on failure to complete the PIP, do constitute 'advantages'" under § 4303(2)); *see also Harris*, 322 F. Supp. 2d at 1324 ("[A] poor evaluation, if it prevents a raise, denies a benefit of employment.") (citation omitted).  Thus, the court must ascertain whether Mr. Freeman meets his burden of showing that his military status was a motivating factor with respect to these claims.

A "discriminatory motive 'may be reasonably inferred from a variety of factors, including proximity in time between the employee's military activity and the adverse employment action.'" *Harris*, 322 F. Supp. 2d at 1325 (quoting *Sheehan*, 240 F.3d at 1014).  However, temporal proximity alone, without additional evidence of animus or inconsistencies in an employer's actions, may not

sufficiently demonstrate an improper motive.  *See Coffman*, 411 F.3d at 1239
(affirming summary judgment where plaintiff showed close proximity in time
between his military service and a decision not to hire, but showed nothing more
to evidence hostility or inconsistency in the employer's proffered reason for not
hiring him); *Vegas-Colon*, 625 F.3d at 29 (granting defendant summary judgment
where "other than proximity in time, [the plaintiff] has not come forth with any
evidence that his military status was a motivating factor" in his low performance
ratings and where the defendant sufficiently established it would have taken an
adverse action regardless of his military affiliation); *Sanguinetti*, 114 F. Supp. 2d
at 1319 ("Aside from the correlation in timing, plaintiff offers nothing but his own
speculation to establish a nexus between his military orders and his termination.").
Thus, to survive summary judgment, Mr. Freeman must demonstrate more than
mere suspect timing before the evidence can rise to a level that supports an
inference of discrimination or retaliation.  *See id.*

(a) 2001 Write-ups, Final Notice of Termination, and January 2002
Performance Review

An employer may not discriminate or take an adverse employment action
against any person because that person has sought to enforce a protection afforded
under the USERRA or has exercised a right provided by USERRA. § 4311(b).

Mr. Freeman points to his 2001 write-ups, the final notice of termination he received from Kahrig and Fowler, and his subsequent January 2002 performance review as evidence of discrimination and retaliation against him for attending mandatory drill duty, receiving a notice of a potential call to active duty after September 11, 2001, and for his subsequent complaint to the DOL.

Specifically, Mr. Freeman claims that shortly after he notified his store manager, Smith, of President George W. Bush's decision to place all reserve military personnel on alert status for impending deployment on September 11, 2001, Pl. Dep. 42:12 - 43:12,[20] his assistant manager, Kahrig, told him that he "needed to choose between Home Depot and the military," Pl. Dep. 41:13-18, told him "I'll help you make that choice" by changing his schedule to ensure conflicts between work and drill duty, Pl. Dep.43:14 - 44:1, and, with the approval of the new store manager Fowler, issued Mr. Freeman disciplinary write-ups in October, November, and December for attending mandatory drill duty, Pl. Dep. 46:13 - 47:6, 310:3-13.  When Mr. Freeman complained, Fowler told him, "If you're full-time, your availability is any time," and that his military duty was only "part-time."  Pl. Dep. 44:17 - 45:1.  Based on the three write-ups, Fowler and Kahrig

---

[20]Smith, who expressed support for Mr. Freeman's military duty, Pl. Dep. 41:5-12, left Home Depot shortly thereafter in October 2001, Pl. Dep. 44:2 - 45:11.  Fowler replaced Smith. *Id.* 44:2 - 45:11.

issued Mr. Freeman a written disciplinary warning in December 2001 putting him

on notice for termination.  Pl. Dep.47:2-11.

Mr. Freeman then filed a complaint with the DOL, a complaint he initialed

on December 22, 2001, but which the DOL stamped  received on January 22,

2002.  Doc. 41-16 at 1-2.  On January 29, 2002, Kahrig issued Mr. Freeman an

overall performance review rating of "1: Needs Much Improvement," the lowest

available rating.  Doc. 41-2 at 6.  Although Kahrig's review did not mention Mr.

Freeman's military status or the DOL complaint, *see* doc. 41-2, nonetheless, Mr.

Freeman believes he received the negative review and the resulting lack of pay

raise in retaliation for the DOL complaint.  Pl. Dep. 62:7-13.

Defendant concedes that at least Kahrig behaved improperly in 2001, but

asserts that it  reversed any adverse actions,  doc. 40 at 27 n.15, when it

terminated Fowler and Kahrig in early 2002 for undisclosed reasons, and gave Mr.

Freeman a pay raise on February 1, 2002, doc. 41-13, after it changed Kahrig's

performance review, doc. 41-12at 36.[21]  However, Defendant presented no

evidence to show that it terminated Kahrig and Fowler or that it raised Mr.

---

[21]Mr. Freeman's personnel file reflects a hand-written note on his January 29, 2002
review that states "Changed to 'C' Rating. Reviewed by Kevin King."  Doc. 41-12 at 36.
However, Mr. Freeman testified at his deposition that it was his new store manager, Brian
Richardson, who awarded him the pay raise and performance adjustment.  Pl. Dep. 90:9 - 91:6.

Freeman's pay *in connection with* the alleged discrimination and retaliation. Indeed, Mr. Freeman testified that Defendant told him the pay raise was unrelated to Fowler or Kahrig's conduct. Pl. Dep. 91:9 - 92:15.  Moreover, although the DOL asked Defendant to expunge the Fowler and Kahrig write-ups, the write-ups remain in Mr. Freeman's personnel file.  Pl. Dep. 111:15 - 121:17, 311:1-23. Consequently, although the DOL informed Mr. Freeman that it was releasing, over Mr. Freeman's objection, his case because it believed it had done all it could do, Mr. Freeman continued to pursue his DOL complaint "[b]ecause the merit increase did not have anything about the write-ups [and he] felt that the write-ups would still affect [his] career at Home Depot." *Id.* 93:3-14.

Here, Defendant essentially concedes, at least, that an inference of discriminatory motive can be drawn from Kahrig's comments and his subsequent treatment of Mr. Freeman.  In addition to comments specifically demanding that Mr. Freeman choose between the military and Home Depot, Mr. Freeman also testified that Defendant purposefully changed his schedule to conflict with his military drills and that each of his disciplinary write-ups occurred immediately following his absence from work to attend those drills.  Uncontested, such testimony alone likely supports a denial of summary judgment. *See, e.g.*, *Harris*, 322 F. Supp. 2d at 1326 (denying summary judgment where plaintiff points to

58

comments specifically referencing his military service as a basis for the decision in

conjunction with an adverse action in close proximity to the time the plaintiff

informed his employer that he may be away for military service); *Mullins*, 694 F.

Supp. 2d at 788 (denying summary judgment based on the employer's reference to

plaintiff's absence from work due to a deployment in Iraq as a reason to deny

promotion).

Moreover, Mr. Freeman's poor review on January 29, 2002, when compared

to the allegedly laudatory review and pay raise he received from a new supervisor

in February 1, 2002, *see* Pl. Dep. 90:9 - 91:16; docs. 41-12 & 41-13, demonstrates

an inconsistency that supports  Mr. Freeman's claim that his January 2002

performance review by Kahrig resulted from discrimination for his military

absences or retaliation for his DOL complaint.  Likewise, the proximity in time

between the DOL complaint, which Mr. Freeman allegedly filed in late December

2001 and DOL received January 22, 2002, and the January 29, 2002, performance

review, supports an inference of discrimination.  *See* docs. 41-16; 41-2.

When viewed in a light most favorable to Mr. Freeman, genuine issues of

material fact exist with respect to Defendant's attempts to force Mr. Freeman not

to attend his drill duty and, ultimately, with the discipline he received for attending

those drills.  *See Conners*, 679 F. Supp. 2d at 226 (denying summary judgment in

light of disputed facts surrounding the dispute between employee and employer

regarding his military drill day).  A reasonable jury could find that Mr. Freeman's

military status was a motivating factor in the write-ups, and notice of termination

in 2001.  Likewise, in light of its acceptance of Kahrig and Fowler's treatment of

Mr. Freeman, Defendant cannot show it would have taken the same actions absent

Mr. Freeman's military status.  Thus, Mr. Freeman's retaliation and discrimination

claims based on the 2001 conduct survive summary judgment.

(b) <u>December 2004 Review and PIP</u>

Mr. Freeman testified that, on several occasions, George, his supervisor,

expressed disapproval about Mr. Freeman's military status and the military's

engagement in Iraq.  Pl. Dep. 33:2-12, 197:3-20, 280:10-23.  Additionally, when

Mr. Freeman informed George of his impending tour of duty during the overnight

shift between December 6, 2004, and December 7, 2004, Pl. Dep. 153:14 - 156:18,

George told Mr. Freeman that he would not hold a position for him during his

deployment.  *Id.* 189:8-13.  Later on December 7, 2004, within 24 hours of

notifying George of his upcoming deployment, Mr. Freeman received a

performance review that rated him in the lowest tier.  Doc. 41-9 at 2.  That review

also placed Mr. Freeman on a 90-day PIP which required improvement to avoid

termination.  *Id.*[22]  Also, the PIP made Mr. Freeman ineligible for a pay raise in

January of 2006.  Doc. 41-15.  ¶¶ 6-8.

Mr. Freeman's USERRA claim is undermined by his testimony that George

disliked him due to his unwillingness to help George discharge McGrew, George's

rival for the affections of a woman, and Mr. Freeman's role in recovering a lawn

mower George allowed a customer to take without paying.  Indeed, at times, Mr.

Freeman seems to make this lawn mower incident the focal point of George's

animus toward him:

> A (Mr. Freeman): She can justify some of the rogue behavior of Mr.
> Dale George.
> Q (Defense counsel): What do you mean justify?
> A: The incident with the lawn mower, the incident of writing unfair
> reviews to people he disliked.
> Q: And he disliked you, right?
> A: Yes, ma'am.
> Q: And you believe he wrote you an unfair review because he disliked
> you?
> A: Yes, ma'am, because I did not - - because of the incident with him
> letting the customer go with the riding mower.
> Q: Right.
> A: I think he disliked me from that point on.
> Q: And you believe that's really what motivated his taking these actions
> against you?

---

[22]Mr. Freeman also testified that he filed another DOL complaint in early 2006, Pl. Dep.
264:2-9, 285:22 - 286:6, though the court received no copy of that complaint. Mr. Freeman
appears to use this complaint as a basis for some of his allegations of retaliation.  However, Mr.
Freeman failed to identify any adverse action taken *after* he allegedly complained to the DOL.
Thus, to the extent Mr. Freeman's 2006 DOL complaint forms the basis for the protected conduct
supporting his retaliation claim, it appears to be irrelevant.

A: Yes ma'am.

Pl. Dep. 356:19 - 357:14.

Mr. Freeman testified also that he did not know whether he complained that George issued the PIP in retaliation for his military service or because of his disagreement with George over McGrew and the lawn mower incident. *Id.* 210:5 - 212:1. Notably, Mr. Freeman's Store Manager, J.King, confirmed that he met with Mr. Freeman on December 7, 2004, to discuss the PIP, but believes that Mr. Freeman informed him of the impending deployment the following day, December 8, 2004. Doc. 41-15. ¶¶ 6, 8. Significantly, J.King gave the final approval on the PIP, *id.*, although George is identified as the supervisor who wrote and issued the PIP, doc. 41-9 at 2.

As noted above, while a discriminatory motive may be inferred from proximity in time between an adverse action and military service, proximity in time alone is rarely enough. *See supra* IV.D.*(iv)*. Mr. Freeman must show evidence that a discriminatory motive influenced the employer's decision. Nonetheless, here, a jury could infer that, based on the proximity between the time Mr. Freeman informed George of his deployment and the negative review and PIP, Mr. Freeman's military duty factored in, influenced, or motivated Defendant's decision. *See Harris*, 322 F. Supp. 2d at 1325 (allowing an inference of

62

discrimination from proximity of less than one month's time between notice of active duty and an adverse employment action). This inference exists here, notwithstanding the non-military related animus between Mr. Freeman and George, because George purportedly expressed disapproval of Mr. Freeman's military service and the Iraq campaign. This expressed animus and the timing suggests that it may have factored also into George's decision to recommend the PIP. Moreover, Mr. Freeman testified that the PIP deviated from Defendant's normal process for discipline, which progresses from written warnings, to counseling, and then a final probation (i.e. a PIP). Pl. Dep. 309:7-13. Here, Mr. Freeman received no warnings or reprimands prior to the PIP. *Id.* 39:9 - 40:11. This deviation from policy and the anti-military comments are sufficient for this claim to survive summary judgment and go to a jury trial where Defendant is free to argue that George's animus, if any, was based on the lawn mower incident and/or Mr. Freeman's refusal to transfer George's rival for the affections of another employee.

Defendant argues that J.King approved the 90-day PIP on December 7, 2004, before learning the following day about Mr. Freeman's scheduled deployment. Doc. 41-15. ¶¶ 6, 8. Thus, Defendant asserts that, even if Mr. Freeman's testimony and the timing of his PIP are sufficient to allow an inference

of discriminatory motive, Defendant would have still placed Mr. Freeman on probation regardless of his military service or his earlier DOL complaints.  *See* doc. 40 at 27-28, n.17.

As a general rule, a recommendation for adverse action by a party who lacks decision-making power may be actionable if the plaintiff shows that the recommendation directly resulted in the adverse employment action.  *Dees III*, 368 F. App'x at 51 (citing *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir. 1999)).  "In proving that the discriminatory animus caused the adverse employment action, [courts] recognize the 'cat's paw' theory, where 'causation may be established if the plaintiff shows that the decisionmaker followed the biased recommendation [of a nondecisionmaker] without independently investigating the complaint against the employee.'"  *Id.*  The Supreme Court recently expounded upon its "cat's paw" jurisprudence, explaining "that if a supervisor performs an act motivated by [unlawful] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable," even if the final decision maker did not know of the discriminatory animus and harbored no such animus himself.  *Staub v. Proctor Hosp.*, - - - U.S. - - - , 131 S. Ct. 1186, 1194 (2011) (emphasis in original).

Here, if Mr. Freeman's military service and impending deployment motivated George's decision, in part, to place Mr. Freeman on probation, then J.King's ignorance about the deployment does not absolve Defendant of liability, absent an independent inquiry by J.King and evidence that George's decision did not influence J.King. Simply put, Defendant does not assert any independent evaluation by J.King. Instead, J.King apparently relied upon George's recommendation. Likewise, Defendant's assertion that Mr. Freeman's "consistently average work warranted a PIP" is unsupported by either citation to progressive disciplinary policy or to anecdotal evidence from Mr. Freeman's work history. Indeed, that Mr. Freeman has received "average" ratings for several years but only placed on PIP when he told his supervisor of his deployment only accentuates the inconsistency of Defendant's claim.

Moreover, the court notes an inconsistency with Mr. Freeman's prior reviews and the December 7, 2004, review, which led to the PIP – prior supervisors rated Mr. Freeman in the third-tier, but George rated Mr. Freeman in the fourth-tier after learning of his deployment. *Compare* docs. 41-4, 41-5, 41-6, 41-7, & 41-8 *with* doc. 41-9. Inconsistencies in an employer's proffered reason for an adverse action, a close proximity between that action and notice of military service, and allegedly anti-military statements, including a promise not to hold

open a position, constitute sufficient evidence to raise genuine issues of fact

regarding the propriety of the review. *See, e.g.*, *Harris*, 322 F. Supp. 2d at 1328

(denying summary judgment in light of earlier statements indicating military

service influenced a different decision in conjunction with inconsistencies in

employer's reasons for a negative performance review); *Fannin*, 2009 WL

139878, at *12 ("The Court finds that a genuine issue of material fact exists as to

Defendants' motivation in assessing Plaintiff with a "2" on the first Performance

Review completed following Plaintiff's insistence that he be returned to the

Manager I position and his exercise of his rights under USERRA."). *Id*.

　　Given the record before it, the court concludes that genuine issues of

material fact remain with respect to Mr. Freeman's allegation of discrimination

involving and preceding the 2004 PIP and, in particular, regarding whether George

informed Mr. Freeman he would not hold the position open and subsequently

placed him on 90 days of probation.  When viewed in a light most favorable to Mr.

Freeman, a reasonable jury could infer a discriminatory motive.  And, as

illustrated above, Defendant failed to demonstrate it would have taken the same

action regardless of Mr. Freeman's military service.  Accordingly, the court denies

summary judgment on the discrimination claims based on the 2004 review and

PIP.

*(v) Reductions in Workforce*

In support of his retaliation, discrimination, and harassment claims, Mr. Freeman testified that Defendant reduced the associate workforce in many of the departments he oversaw shortly after transferring him to those departments: "every department I go to, all of a sudden the staff is reduced."   Pl. Dep. 204:11-12; *see also* 200:13 - 209:2.  However, Mr. Freeman offered non-retaliatory and non-discriminatory  reasons for the decision, i.e. Defendant knew he was a hard worker and could handle the reduced team.  *See* Pl. Dep. 200:13 - 209:2.  Indeed, Mr. Freeman repeatedly testified that his work performance caused the reduction in workforce – "[t]hey knew that the person that I am, failure is not an option with me."  *Id.*  Unfortunately for Mr. Freeman, he presents no evidence that Defendant targeted him because of his military status.  Moreover, his testimony that Defendant targeted him because he could accomplish more with less belies his contention that Defendant's reduction evidences discrimination, retaliation, or harassment.  In short, Mr. Freeman cannot establish a prima facie case,[23] and, accordingly, summary judgment is due on the reduction in workforce claims.

_____

[23] In addition, Jeff King, who became the Mr. Freeman's store manager in June 2003, testified that reductions in workforce are routine and occur based on the seasonal needs of various departments.  Doc. 41-15 ¶¶ 4-5.  Indeed, Mr. Freeman admits that at least some of these reductions occurred in conjunction with seasonal demands, particularly in the fall when the gardening department sees less traffic: it "was changing seasons" and "growing season was over."  *See* Pl. Dep. 200:13 - 201:5-15.

*(vi) Mr. Freeman's Surviving Claims*

For clarity and ease going forward, the court summarizes the remaining claims in this case.  Mr. Freeman's retaliation, discrimination, and harassment claims survive, but the only factual basis Mr. Freeman may use to support those claims are the following:

(1) Mr. Freeman's write-ups by Kahrig and Fowler in 2001 for his mandatory weekend duty;

(2) Mr. Freeman's final warning order in 2001 for mandatory weekend duty and his filing of a DOL complaint;

(3) Kahrig and Fowler's alleged attempts to prevent Mr. Freeman from attending drill duty in 2001 and to force him to choose between military service and employment with Defendant, including any comments made to that effect;

(4) Mr. Freeman's December 7, 2004, performance review and Defendant's placement of Mr. Freeman on PIP;

(5) Comments made by Dale George regarding Mr. Freeman's military status and an unwillingness to hold a position while Mr. Freeman was deployed.

Because the court agrees that Defendant's motion is due to be granted with respect to Mr. Freeman's promotion, wage/bonus, and workforce reduction allegations, those shall not form the basis of his surviving claims.

## V. CONCLUSION

As explained more fully above, the court **GRANTS**, in part, and **DENIES**, in part, the motion for summary judgment.  Specifically, Mr. Freeman's claims for discrimination, harassment, and retaliation survive only with respect to the 2001-2002 allegations regarding Kahrig and Fowler and the 2004 George allegations.

**DONE** the 29th day of September, 2011.

_____

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE